## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**AARON KITZLER**                                                **CIVIL ACTION**

**VERSUS**                                                       **NO. 22-1263**

**TIM HOOPER, WARDEN**                                           **SECTION: "B"(5)**

### REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Aaron Kitzler, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    In June 2013, he was charged by grand jury indictment with one count of aggravated rape of a person under 13 years of age (K.K.) and one count of molestation of a juvenile (A.C.). [1]    On October 29, 2014, a jury found him guilty of

---

[1]  State Rec., Vol. 1 of 11, Grand Jury Indictment, Parish of Washington (charging one count of aggravated rape of K.K. between March 14, 2009 and November 18, 2012, pursuant to La. R.S. 14:42 A(4), and one count of molestation of a juvenile, A.C., between August 1,

aggravated rape and not guilty of molestation of a juvenile.[2]

The Louisiana First Circuit Court of Appeal summarized the facts[3]  adduced at trial

regarding the offense of conviction:

> K.K. (the victim) is the daughter of L.K., and the former stepdaughter of
> defendant.[4]   K.K. was born on March 14, 2000. L.K. and defendant began
> dating in 2004, and they married in October of 2005. They divorced in May of
> 2014.
>
> At trial, K.K. testified that defendant forced her to engage in oral and vaginal
> intercourse, beginning when she was nine years old while living in Mount
> Hermon, Louisiana. She stated that defendant raped her multiple times over
> the course of three years. According to K.K., these incidents would occur on
> nights when her mother was at work. She testified that defendant told her not
> to tell anyone, or he would beat her "half to death." K.K. described defendant's
> private area as being shaved. K.K. repeated the substance of these allegations
> of abuse in two recorded interviews that were introduced at trial—a
> Children's Advocacy Center (CAC) forensic interview with JoBeth Rickels, and
> a patient medical history with Nurse Anne Troy at the Audrey Hepburn Care
> Center.
>
> K.K. testified at trial that the abuse stopped when, on November 18, 2012, she
> told her aunt (T.C.) and a family friend, Michelle Almanza, about having been
> raped. K.K. made her report of abuse to the sheriff's office on that same date.
> According to K.K., she had previously tried to tell her mother, grandparents,

2005 and December 31, 2010, pursuant to La. R.S. 14:81.2).

[2]   State Rec., Vol. 1 of 11, Trial Minute Entry, 10/29/2014.

[3]   In the instant case, the charged offenses concern two separate alleged victims, K.K.
(count one) and A.C. (count two), and two different periods of time. Because defendant was
found not guilty on count two, the evidence presented at trial relating to that offense is not
detailed in this opinion, except where it may be relevant to issues concerning the conviction
on count one.

[4]   In accordance with La. R.S. 46:1844(W), the victim and her immediate family
members are referred to by their initials throughout this opinion.

and other family members about the abuse, but they did not believe her.

L.K. testified at trial regarding K.K.'s prior allegations of abuse. She stated that on two occasions prior to November 18, 2012, K.K. said that defendant had been messing with her. According to L.K., she told K.K. both times that she would have to involve the police, at which point K.K. recanted her statement. L.K. explained that on the first occasion, K.K. made the accusation because she was mad that she was being forced to leave a friend's house, and she later admitted that she lied about defendant touching her. On the second occasion, K.K. made the allegation to her grandmother and aunt while she was at a campground for a family gathering. Both times, L.K. presented the allegations to defendant, and he denied ever having touched K.K. At trial, L.K. testified that she believed K.K.'s instant allegations of abuse because K.K. did not change her story this time, and she never recanted despite having been moved into a foster home. L.K. confirmed that defendant kept his private area shaved. On cross-examination, L.K. testified that she discovered at one point during her marriage to defendant that he had been seeing Almanza behind her back. She was aware that they had kissed, but unsure if they had engaged in any sexual behavior. According to Almanza's trial testimony, A.C. (the alleged victim in count two) reported in 2009, when she was sixteen, that she had been having oral and vaginal sex with defendant. Almanza allegedly confronted defendant about A.C., but neither she nor A.C. reported defendant to the police. Almanza testified that on November 18, 2012, K.K. told her that defendant had been sexually abusing her. She testified that she asked K.K. to describe defendant's private area, which she did.[5] According to Almanza and A.C.'s own trial testimony, A.C. confirmed the appearance of defendant's private area based on K.K.'s description. On cross-examination, Almanza denied ever dating or sleeping with defendant.

Defendant testified at trial. He stated that he began a relationship with Almanza while he was married to L.K. According to defendant, this relationship came to light when L.K. saw him and Almanza kissing at a party. Defendant stated that he begged L.K. to forgive him—which she did—and later told Almanza to "stay away" and that he did not want her around anymore. Defendant categorically denied ever having touched K.K. in an inappropriate way, including forcing her to engage in any type of sexual intercourse. On cross-examination, defendant admitted that he kept his private area shaved.

---

[5]  Although not explicitly stated by Almanza's testimony, the implication is that K.K. described defendant's private area as being clean shaven.

After deliberating, the jury returned verdicts finding defendant guilty of the aggravated rape of K.K., but not guilty of molesting A .C.[6]

Shortly after trial, K.K. recanted her testimony and the defense filed a motion for a new trial.[7]    In her affidavit,[8]  K.K. claimed that Kitzler never molested her or touched her inappropriately and that Almanza forced or coerced her into making the false allegations against him.    The trial court held three separate hearings (January, March and April of 2015) before denying the motion for new trial.[9]

On direct appeal, the appellate court summarized the evidence from the new trial hearings:

> At the first hearing, J.B. (K.K.'s grandmother) testified that K.K. returned to live at her mother's home after trial, having resided in foster care for much of the period since her report of abuse. According to J.B., K.K. told her that she did not want defendant to go to jail for something he did not do, and she explicitly stated that defendant never touched her. J.B. stated that K.K. told her she had been coaxed by Almanza into making the accusation against defendant. On cross-examination, J.B. admitted under the state's questioning that L.K. did not currently have a job and that defendant had a good job at the time of his arrest.

---

[6]  *State v. Kitzler*, 2015 KA 1517, 2016 WL 3746380, at *1 (La. App. 1 Cir. 2016) (footnotes in original).

[7]  State Rec., Vol. 1 of 11, Motion for New Trial.

[8]  Rec. Doc. 3-2, pp. 47-48 (K.K.'s Affidavit signed and notarized November 10, 2014). K.K. later wrote to Kitzler in prison reiterating his innocence.    That letter, dated June 29, 2016, was introduced during post-conviction relief proceedings.    Rec. Doc. 3-2, p. 44.

[9]  State Rec., Vol. 1 of 11, Minute Entry, 4/24/2015; *see also* State Rec., Vol. 3 of 11, Transcript of Motion for New Trial, Evidentiary Hearing #1 (Jan. 29, 2015); Evidentiary Hearing #2 (March 5, 2015); Evidentiary Hearing #3 (Apr. 24, 2015), p. 26.

K.K.'s brother also testified at this first hearing. He stated he had heard A.C. say that her own allegations against defendant were not true and that she made them because her mother (T.C., the aunt who was present with Almanza at K.K.'s disclosure) had threatened her to do so.[10]   K.K.'s brother also confirmed the victim's post-trial recantation, explaining that K.K. said the allegations were not true and that Almanza forced her into making these allegations by threatening to call the Office of Community Services[11]   and have K.K. removed from her home. On cross-examination, K.K.'s brother said that he and his mom were present at their home when K.K. recanted her allegations against defendant.

K.K. herself was also present at this first hearing on the motion for new trial. On the advice of appointed counsel, she invoked her Fifth Amendment right not to testify.

Two additional witnesses testified at the second hearing. K.C., A.C.'s sister and K.K.'s cousin, was the first witness to testify. She stated that she was present, along with her mother (T.C.), Almanza, and K.K., when K.K. made the allegations against defendant on November 18, 2012. According to K.C., K.K. had come to spend the weekend with them. On the night before K.K. made the allegations, the family held a barbecue. K.C. described that Almanza came into the house and asked K.K. to go into the bathroom with her. K.C. did not know what occurred while K.K. and Almanza were in the bathroom, but they were in there for approximately five to ten minutes. Almanza exited the bathroom first, with K.K. exiting shortly after. According to K.C., everything seemed normal at the time. K.K. made her allegation the following afternoon. K.C. testified that she talked to K.K. "a couple of times" about the incident, and "her story never changed." After trial, K.C. again spoke with K.K., at which time she stated that Almanza had forced her to make the allegations. On cross-examination, K.C. said that L.K. brought up the topic of K.K.'s recantation when K.C. saw K.K., her brother, and L.K, at a Dollar Store in Mount Hermon.

Jeremy Williams, a friend of K.K.'s family, also testified at the second hearing. He described that on the day K.K. made her allegations, he was outside of T.C.'s house as a police officer walked K.K. to his car. According to Williams, K.K. told

---

[10]   At trial, K.K.'s brother testified to this same effect as a defense witness.

[11]   The Office of Community Services has been renamed the Department of Children and Family Services.

him at that point, "I said something wrong and they're bringing me to another home." He stated that K.K. also said, "I got pressured into saying stuff about my dad touching me." Williams said that when he pressed K.K. further, the police officer told K.K. she could not say anything else and that she had to get into the car. Williams stated that he later talked to K.K. after the trial, and she repeated she had been pressured into making the allegations. On cross-examination, Williams admitted that L.K. was present for K.K.'s post-trial recantation. He also acknowledged that he never went to the police about what K.K. allegedly told him on the day of her report, but he explained on re-direct examination that he did not know he was supposed to tell anyone and preferred to stay out of what he considered to be family business.

K.K. was the sole witness to testify at the final hearing on the motion for new trial. Waiving her rights under the Fifth Amendment, K.K. admitted she had previously testified that defendant raped her. However, she stated this allegation was untrue and that she had been forced into making it. K.K. testified that defendant never sexually assaulted her or physically harmed her in any way. She explained that Almanza had forced her into making the allegation out of revenge, because defendant had gone back to L.K. instead of being with her. K.K. stated that Almanza had taken her into the bathroom and told her to make the allegations, or else she would make them against defendant, K.K.'s mother, and her grandparents. K.K. testified that she was scared of Almanza's threat because she believed that she and her brother would be placed up for adoption if she did not make the allegation. On cross-examination, K.K. admitted that she had been in OCS custody for approximately twenty-three months during the pendency of defendant's trial, having been returned to her mother after the trial was completed. K.K. admitted to making the consistent allegations of abuse to multiple parties, including the police, OCS, JoBeth Rickels, Anne Troy, a therapist, the assistant district attorney, and the jury. On re-direct examination, K.K. implied that she perceived a difference between adoption and foster care, with the latter meaning she might eventually be able to go home. According to K.K., the threat of adoption was made by T.C., A.C., and Almanza.[12]

After denying the motion for new trial without oral or written reasons, the trial court

sentenced Kitzler to life imprisonment without benefit of probation, parole or suspension of

---

[12] *Kitzler*, 2015-1517, 2016 WL 3746380, at *3-4.

sentence.[13]    The motion to reconsider sentence was denied.    Kitzler appealed.

In his sole assignment of error on direct appeal, Kitzler argued that the trial court erred in denying his motion for new trial.    On June 14, 2016, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[14]    On December 5, 2016, the Louisiana Supreme Court denied his application for writ of certiorari.[15]

On December 12, 2017, Kitzler's post-conviction counsel, Samuel H. Winston, filed an application for post-conviction relief in the state district court.[16]    He raised four claims for relief:    (1) newly discovered evidence indicates that K.K. has renewed and still maintains her recantation of her original trial testimony; (2) newly discovered evidence that K.K. was not competent to testify at trial; (3) he was denied effective assistance of counsel for failing to investigate conflicting stories of witnesses and failing to consult with and hire a competing expert on child interview techniques; and (4) he was denied due process under *Brady v. Maryland* when the State failed to disclose conflicting witness statements.    He requested,

---

[13]   State Rec., Vol. 1 of 11, Sentencing Minute Entry, 4/24/2015.

[14]   *State v. Kitzler*, 2015-KA-1517, 2016 WL 3746380 (La. App. 1 Cir. 2016).

[15]   *State v. Kitzler*, 2016-K-1349 (La. 2016), 308 So.3d 705 (Hughes, J. would grant and Crichton, J, would grant and assigns reasons); State Rec., Vol. 8 of 11 (Tab 2). Defense counsel, Timothy Yazbeck, filed the Louisiana Supreme Court supervisory writ application on behalf of Kitzler.

[16]   State Rec., Vol. 4 of 11, Tab 1, Initial Application for Post-Conviction Relief.

and was given, additional time to supplement the claims.[17]

On or about April 1, 2018, counsel for Kitzler filed a memorandum in support supplementing the first two claims and requesting more time to supplement claims three and four.[18]   He argued that the guilty verdict was infirm based on K.K.'s recantation of her trial testimony, K.K.'s testimony at the new-trial hearing, and new evidence of a letter she wrote to her stepfather in prison stating that he was innocent.   He also asserted that his recent discovery of the report assessing K.K.'s competency[19] and the fact that his trial counsel failed to use it during the new-trial proceedings, undermined the verdict and demonstrated ineffective assistance of counsel.   He asked for more time to supplement because the application was still incomplete, and the state district court agreed to stay the matter until counsel for petitioner notified the court that he was ready to proceed.[20]

On December 7, 2018, he filed a supplemental memorandum in support of claim three, alleging ineffective assistance of trial counsel, and only a "reservation of rights" as to claim four (the *Brady* claim).[21]   He alleged that "the [*Brady*] claim is based on

---

[17]   State Rec., Vol. 4 of 11, Tab 2, District Court Order, 12/19/2017.

[18]   State Rec., Vol. 4 of 11, Tab 3, Memorandum in Support of Initial Application for Post-Conviction Relief and Motion for Additional Time to Supplement Claims 3 and 4.

[19]   State Rec., Vol. 4 of 11, Tab 3-A (Alicia Pellegrin report).

[20]   State Rec., Vol. 4 of 11, Tab 4, District Court Order, 4/16/2018.

[21]   State Rec., Vol. 4 of 11, Tab 5, Supplemental Memorandum in Support of Claims 3 and 4.

representations made by trial counsel that he received a conflicting witness' statement from K.K. after trial during the recantation proceedings, which was a statement he had not previously been given by the State."[22]   He conceded that he could not independently verify the claim and attributed his inability to support the *Brady* claim to the State's incomplete public-records request return.   He asked in the memorandum that the State be ordered to disclose the full file and that trial counsel be allowed to testify to the nature of this conflicting statement at an evidentiary hearing.

In May 2020, counsel for Kitzler filed an application to inspect the jury polling slips. The request was granted, but did not lead to an additional claim for relief.[23]   Finally, on July 20, 2020, Kitzler's counsel stated that after reviewing the polling slips and the records for the case in the State's possession, the application was complete and he was ready to proceed.[24]   The State submitted a response on or about October 14, 2020.[25]   On January 13, 2021, the state district court denied relief.[26]   In written reasons, the state district court rejected the first claim as repetitive, citing the direct appeal, and alternatively, found it lacked merit.   The court rejected as meritless the second and third claims concerning the newly

---

[22]   *Id*. at p. 4.

[23]   State Rec., Vol. 4 of 11, Tabs 6, 7.

[24]   State Rec., Vol. 4 of 11, Tab 6, Correspondence, 7/20/2020.

[25]   State Rec., Vol. 4 of 11, Tab 8.

[26]   State Rec., Vol. 4 of 11, Tab 9, Order denying PCR, 1/13/2021.

discovered evidence of Dr. Pellegrin's report about K.K.'s competency and trial counsel's ineffectiveness.    The district court rejected the fourth *Brady* claim, which counsel had failed to supplement with evidence, as entirely unsupported and meritless.    On October 1, 2021, the Louisiana First Circuit Court of Appeal denied his related application for supervisory writs without cited reasons.[27]    On March 2, 2022, the Louisiana Supreme Court denied relief.    The Louisiana Supreme Court found that he failed to show that he received ineffective assistance of counsel or that the State withheld material exculpatory evidence under *Brady*.    As for the remaining claims, the Louisiana Supreme Court found that he failed to meet his burden of proof and/or the claims were repetitive.[28]

In May 2022, Kitzler submitted this federal application for habeas corpus relief.[29] He asserts two grounds for relief:    (1) "newly discovered evidence indicates that K.K., the alleged victim, has renewed and still maintains her recantation of her original trial testimony in violation of the Fifth, Sixth and Fourteenth Amendment to the Constitution" and (2) "new discovered evidence that K.K., the alleged victim in this case, was not competent to testify at

---

[27]    State Rec., Vol. 10 of 11, *State v. Kitzler*, 2021-KW-0780, 2021 WL 4494078 (La. App. 1 Cir. Oct. 1, 2021).    The state-court record shows that an earlier writ application was denied on the showing made and he was allowed time to file a new application. State Rec., Vol. 9 of 11, *State v Kitzler*, 2021 KW 0244, 2021 WL 2099601 (La. App. 1 Cir. May 24, 2021).

[28]    State Rec., Vol. 11 of 11; *State v. Kitzler*, 2021-KH-01824 (La. 2022), 333 So.3d 823 (Hughes, J., would grant and order evidentiary hearing and Griffin, J. would grant).

[29]    Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

trial."[30]   The State does not assert that the petition is untimely or that he failed to exhaust available state-court remedies.[31]   The State argues that the claims do not merit relief. Kitzler has not filed a reply to the State's response.

**Standards of Review on the Merits**

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.   A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").   With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable

---

[30]   *Id.* at pp 4-6.   In contrast, his memorandum in support identifies only a violation of the Sixth and Fourteenth Amendments to the Constitution.   Rec. Doc. 3-1, p. 11.

[31]   Rec. Doc. 8, State's Response, p. 6.

application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."   *Bell v. Cone*, 535 U.S. 685, 694 (2002).   A state court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.   *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).   An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case."   *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 572 U.S. 415, 426 (2014).

It is well-established that "an unreasonable application is different from an incorrect one."   *Bell*, 535 U.S. at 694.   A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.   *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").   "[E]ven a strong case for relief does not mean the state

court's contrary conclusion was unreasonable" under the AEDPA.   *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Id.* (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

Review under Section 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits.    *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).    With respect to claims that have not been adjudicated on the merits by the state courts, a federal court does not conduct review pursuant to 28 U.S.C. § 2254(d).    Instead, the Court applies a *de novo* standard of review.    *See Hoffman v. Cain*, 752 F.3d 430, 437 (5th Cir. 2014); *In Re: Paredes*, 587 F. App'x 805, 814 (5th Cir. 2014).

## Analysis

*1.    Newly discovered evidence of K.K.'s Recantation – Actual Innocence, Brady, Napue, Due Process/Fair Trial*

Liberally construing claim one, as set forth in his federal application and memorandum in support, Kitzler alleges that he was denied due process of law and a fair trial under the Fifth, Sixth, and Fourteenth Amendments because the State failed to disclose material exculpatory information concerning K.K.'s rape allegations and K.K. testified falsely at trial.    He relies on *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Napue v. Illinois*, 360 U.S.

264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972).   He also asserts a freestanding "actual innocence" claim based on K.K.'s admitted false testimony that resulted in his wrongful conviction for rape.   Because the *Napue/Giglio* and "actual innocence" claims were not fairly presented below, the state courts did not adjudicate the federal constitutional claims on the merits.   *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."); *Gonzales v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011) ("if the state courts fail to adjudicate the petitioner's claim on the merits and the claim is not procedurally barred, no deference is owed to the state-court judgment and the federal courts must instead conduct a plenary review").   Nonetheless, the Court may deny relief on the merits of unexhausted claims, and these claims fail on the merits for the reasons set out below.   28 U.S.C. § 2254(b)(2).

Kitzler's direct appeal presented only state-law grounds challenging the denial of his motion for new trial based on K.K.'s recantation of her trial testimony.[32]   In denying that appeal, the Louisiana First Circuit, applying state law, reasoned:

In *Cavalier*, the Supreme Court stated:

---

[32]  State Rec., Vol. 8 of 11, 2015-KA-1517, Appellant Brief (Tab 3), p. 2.

Newly discovered evidence affecting only a witness's credibility "ordinarily will not support a motion for a new trial, because new evidence which is 'merely cumulative or impeaching' is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial." Nevertheless, the court possesses the discretion to grant a new trial when the witness's testimony is essentially uncorroborated and dispositive of the question of guilt or innocence and it "appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different result." In making this determination, the court may assume that the jury "would have known that [the witness] had lied about the matter[.]"

701 So.2d at 951–52 (citations omitted).

Because the trial court did not give reasons for denying defendant's motion for new trial, we are unsure of the precise basis for this ruling. Considering the four factors from *Cavalier*, 701 So.2d at 951, it appears from the record that the first three elements have been met. We must now determine whether K.K.'s recantation "is of such a nature that it would probably produce a different verdict in the event of retrial." *Id.* In doing so, we consider whether there are any special circumstances to suggest that K.K.'s latest testimony is truthful to an extent that the trial court should have reasonably concluded that K.K.'s recantation would have created a reasonable doubt of guilt in the jurors' minds. *See Prudholm*, 446 So.2d at 736.

At the outset, we have little doubt that K.K.'s recantation, if believed, would create a reasonable doubt of guilt in the minds of jurors. However, the question is whether there are special circumstances to suggest the truthfulness of her latest testimony.

There are many factors weighing in favor of the truthfulness of K.K.'s initial testimony. First, she consistently repeated her story of forced oral and vaginal intercourse spanning three years after the November 18, 2012 report of abuse. The disclosures presented to the jury—K.K.'s testimony, as well as her recorded CAC and medical history statements—were consistent, detailed, and unwavering. K.K. described exactly what sexual acts defendant forced her to perform, provided an accurate description of defendant's pubic area, discussed that defendant did not use a condom, and explained that he ejaculated during these incidents. She testified and reported that the incidents took place at her home, while her mother was away at work, and she stated that defendant threatened to beat her "half to death" if she told anyone, a

phrase that appears consistently within her testimony and reports. Additionally, K.K. testified at trial that she had previously tried to tell other members of her family about the abuse, including her mother and grandmother, but they repeatedly disbelieved her. Further, K.K. testified briefly at trial about times the defendant would show her pictures of naked people, including a picture of a possible ex-girlfriend from his native Ohio. In short, the sheer amount of detail related by K.K. throughout her testimony and recorded statements, with their high degree of coherence and consistency, make them extremely credible. The state also elicited testimony at the post-trial hearings that L.K. was consistently present with K.K. on most occasions when she made a recantation to a third party, and L.K. appears to have been the person who generally raised this issue to others. This casts suspicion upon the truthfulness of K.K.'s recantation, as it possibly could have been coaxed by L.K.

There is little doubt from the record that some degree of animosity existed among Almanza, L.K., and defendant, due to the relationship that existed between Almanza and defendant; however, that relationship does not appear to be the deciding factor in the divorce between L.K. and defendant. L.K. testified at trial as a state witness that she believed K.K.'s allegations of abuse against defendant and divorced him for that reason.

Williams testified that K.K. spoke to him on the day she made her report, and he stated that K.K. told him that she had been pressured; however, he did not testify that K.K. told him she lied.

Finally, K.K. testified regarding her specific fears that caused her to maintain her initial story until after the trial. She stated that T.C., A.C., and Almanza made her fearful that she would be placed up for adoption if she did not maintain her story. K.K. explained that she perceived adoption to be different than being placed into foster care because she believed that she would eventually be able to leave foster care. K.K. explained that her meeting in the bathroom with Almanza lasted approximately five to ten minutes. The record does not reflect what was exactly said in that time period; however, it is unlikely that the two could have concocted such a comprehensive and detailed account of sexual abuse in that short amount of time. All that is known about that conversation comes from K.K., who said Almanza pressured her into making the allegations with the threat of adoption. It should also be noted that K.K. never testified that Almanza told her to lie, but only pressured or threatened her to make the allegations against defendant.

Defendant cites the recent case of *State v. Maise*, 2014–1912 (La. 6/30/15), 172 So.3d 639 (per curiam), as one which presents a factual scenario similar to this one. In *Maise*, the supreme court determined that the defendants were entitled to a new trial based upon newly discovered evidence relating to the credibility of the victim's testimony and that of a corroborating witness.

*Maise*, however, involved a victim who offered different versions of her story "at virtually every juncture of the investigation and prosecution of the [ ] defendants," as well as a corroborating witness who offered two different versions of her story on successive days of testimony, after receiving transactional immunity from the state. *Maise*, 172 So.3d at 645. In contrast to the victim in *Maise*, K.K.'s version of her story was remarkably consistent beginning with her initial report and continuing through the culmination of her trial testimony. Only after defendant had been convicted and K.K. returned to her mother's custody did K.K.'s story change.

We do recognize that the instant case shares a similarity to *Maise* in that K.K. purportedly provided what defendant characterizes as a pretrial recantation to Williams. However, we note an important distinction. In *Maise*, the victim provided an exculpatory version of the events to a friend one week after the defendants' arrests. This phone conversation was heard by the friend who called the victim, as well as by two other individuals who listened in on the call while standing next to the friend. Moreover, the immunity-holding corroborating witness also made a pretrial disclosure to a third party that mirrored the exculpatory version of events related by the victim in her phone call witnessed by three individuals. *See Maise*, 172 So.3d at 644–45.

The circumstances of the instant case are distinguishable in the sense that K.K.'s purported pretrial recantation to Williams was uncorroborated. Also, Williams never testified that K.K. explicitly told him the allegations against defendant were false. Rather, he testified that K.K. stated she was pressured into saying something she believed was wrong. In *Maise*, the multiple sources of the newly discovered evidence created a strong inference of the truthfulness of that recanted version of events. No such strong inference exists here, and the more reasonable inference of truthfulness appears to lie with K.K.'s initial story that she was raped by defendant.

Based on the facts and circumstances of this case, and considering the record as a whole, we find no error or abuse of discretion in the trial court's denial of

the motion for new trial based on newly discovered evidence. The defendant did not adequately demonstrate special circumstances to establish the truthfulness of K.K.'s latest testimony recanting her allegations of sexual abuse. As a result, we cannot say that K.K.'s recantation is anything more than merely cumulative or impeaching of the testimony presented at trial. *See Cavalier*, 701 So.2d at 951.

This assignment of error is without merit.[33]

In his Louisiana Supreme Court writ application, Kitzler generally assigned as error that the appellate court erroneously interpreted and applied Louisiana and United States statutory and constitutional law by affirming the trial court's denial of the motion for new trial.[34] However, like the appellate brief, the writ application included only state-law issues concerning the denial of his motion for new trial under state law based on newly discovered evidence.    The Louisiana Supreme Court denied relief without additional reasons.

On post-conviction review, he renewed the claim that he was entitled to a new trial or evidentiary hearing based on newly discovered evidence, citing to K.K's affidavit, and a more recent letter she sent to her stepfather in prison,[35]   and argued cursorily that the State withheld *Brady* material in the form of conflicting witness statements.[36]    He did not assert

---

[33]   *Kitzler*, 2016 WL 3746380 at *4-7.

[34]   State Rec., Vol. 8 of 11 (Tab 2), Writ Application No. 2016-K-1349, p. 7 (filed by counsel Yasbeck).

[35]   Rec. Doc. 3-2, Exhibits to federal application, p. 44 (Letter from K.K.), p, 46 (Affidavit).

[36]   State Rec., Vol. 4 of 11, Uniform Post-Conviction Relief Application, Memorandum in Support of Initial Application Supplementing Claims 1 and 2, and Supplemental

that the State knowingly allowed perjured testimony under *Napue*.    The record confirms that he did not mention or cite to *Napue* at any state-court level, nor did he raise any other federal constitutional claims with regard to her recantation.    Thus, on post-conviction, he exhausted his claim that the state courts improperly denied his motion for new trial based on newly discovered evidence and that the State violated *Brady*.    The state courts denied his newly discovered evidence claim as repetitive, because it was fully considered and rejected on direct appeal, and, alternatively, as meritless for essentially the same reasons as those stated by the court on direct appeal.    The *Brady* claim was denied on the merits because he failed to show that the state withheld material exculpatory evidence.

The State correctly asserts that habeas corpus does not lie for errors of state law. The state trial court's refusal to grant a motion for new trial under state law based on newly discovered evidence is not cognizable on federal habeas review.[37]    Because the claim does not involve a question of federal or constitutional law and merely requests review of a state-law claim, it is not proper on federal habeas review.    *See Haygood v. Quarterman*, 239 F. App'x 39, 42 (5th Cir. Jun. 14, 2007) (citing *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir.

---

Memorandum in Support of Claims 3 and 4.

[37] In brief, Kitzler also mentions that he was denied an evidentiary hearing on his state-court post-conviction application alleging newly discovered evidence.    Rec. Doc. 3-1, p. 12.    The Court is bound by the "no state habeas infirmities" rule of law from reviewing, if presented, a claim that the state courts during post-conviction proceedings improperly denied him an evidentiary hearing.    *Kinsel v. Cain*, 647 F.3d 265, 273 n. 32 (5th Cir. 2011); *see also Jones v. Butler*, 778 F.3d 575, 586 (7th Cir. 2015).

1991)) (state court's denial of a motion for a new trial does not necessarily constitute a violation of a federal constitutional right).    Importantly, a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding," and instead is limited to review of questions of federal constitutional dimensions.    *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (citation and quotation omitted); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law).    "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Molo v. Johnson*, 207 F.3d 773, 776 n. 9 (5th Cir. 2000) ("Federal habeas review does not extend to state court conclusions of state law.").    A claim based on newly discovered evidence states a ground for federal habeas relief only if it establishes an independent constitutional violation.    *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

Kitzler also raises a claim of "actual innocence" based on K.K.'s recantation. However, no precedent exists for a freestanding "actual innocence" claim affording petitioners federal habeas corpus relief.    Indeed, the United States Supreme Court has not recognized a freestanding innocence claim.[38]    *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citing *Herrera*, 506 U.S. 390, 404-05 (1993)); *House v. Bell*, 547 U.S. 518, 554-55

---

[38]    United States Fifth Circuit precedent likewise precludes his freestanding innocence claim.    *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir. 2014) (citing *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006) ("[A]ctual-innocence is not an independently cognizable federal-habeas claim."); *Matheson v. United States*, 440 F. App'x 420, 421 (5th Cir. 2011).

(2006); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000) (citing *Hererra*, 506 U.S. at 400).    And while a credible showing of actual innocence may provide a *gateway* for federal habeas review of a procedurally defaulted or untimely claim of constitutional error, "[t]his rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."    *Herrera*, 506 U.S. at 404.    This contrasts sharply, as the *Herrera* court observed, with the claim raised by Kitzler here, that he is entitled to habeas relief because newly discovered evidence shows that his conviction is factually incorrect. *Id* at 404.    "[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact."    *Id*. at 400.

Here, the State has not asserted that Kitzler's independent claims of constitutional error are procedurally barred, defaulted or untimely.    Thus, the "actual innocence" gateway exception is not implicated.    Kitzler has no separate stand-alone claim for actual innocence under controlling federal law and the Court will not engage in sheer speculation as to what a freestanding innocence claim in a non-capital case would require, if one existed. *Herrera*, 506 U.S. at 417 ("We may assume, for the sake of argument... that in a *capital* case a truly persuasive demonstration of 'actual innocence' made after trial would render the *execution* of a defendant unconstitutional, and warrant federal habeas relief *if* there were no state avenue open to process such a claim," but noting that "the threshold showing for such an assumed right would necessarily be extraordinarily high"); *see House*, 547 U.S. at 555

(Supreme Court precedent implies a far higher standard and more convincing proof of innocence for a freestanding claim of actual innocence than the gateway standard); *see also Feather v. United States*, 18 F.4th 982, 986–87 (8th Cir. 2021) (rejecting theoretical freestanding actual innocence claim as failing to satisfy extraordinarily high burden where petitioner brought forward affidavits from four now-adult sex abuse victims, who had previously testified at a new-trial hearing, reasserting prior recantations; medical experts' affidavits questioning the qualifications, examination techniques, and medical conclusions of government's trial expert on pediatric assault; and renewed evidence of juror bias); *Cal v. Garnett*, 991 F.3d 843, 850-51 (7th Cir. 2021) (declining to resolve the open question whether petitioners can obtain habeas relief under § 2254 based upon stand-alone claims of actual innocence, especially where petitioner has not shown under § 2254(d)(2), that the state court grounded its rejection of relief in an unreasonable determination of the facts regarding the recanting victim's credibility); *Farrar v. Raemisch*, 924 F.3d 1126 (10th Cir. 2019) (rejecting outright non-cognizable freestanding claim of actual innocence based on recanting victim), *cert. denied*, 141 S.Ct. 234 (2020); *Kinsel v. Cain*, 647 F.3d 265, 270 n. 20 (5th Cir. 2011) (stating in dicta that to the extent petitioner asserted a freestanding actual innocence claim, such a claim was not cognizable and he could not satisfy the standard because recantations are suspect and the victim was not a credible witness).    Kitzler's freestanding "actual innocence" claim does not warrant federal habeas corpus relief.[39]

---

[39]  The Court notes that Louisiana law does provide an avenue for post-conviction

Kitzler also argues that he was denied a fair trial and his conviction violated due process because K.K. now maintains that she testified falsely at trial that he raped her.    In support, he relies on *Brady*, *Napue*, and *Giglio*.    The State correctly asserts that the cases upon which he relies concern the government's non-disclosure of information known to the prosecution but not known to the defense, a situation not presented in this case. [40] Controlling federal law dictates the denial of relief on Kitzler's purported independent constitutional claims under *Brady* and *Napue/Giglio*.

To prove a *Brady* violation, a defendant must establish that the evidence is favorable to the accused as exculpatory or impeachment, that the evidence was suppressed by the State, and that prejudice resulted from the non-disclosure.    *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)); *Reed v. Stephens*, 739 F.3d 753, 782 (5th Cir. 2014).    The State denies a criminal defendant due process when it *knowingly* uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996).    The Supreme Court has repeatedly stated that the Due Process Clause bars conviction based on perjury known by the prosecution to be such.    *See*, *e.g.*, *Napue*, 360 U.S. at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall

---

relief for petitioners raising "actual innocence" claims.    La. C.Cr.P. art. 926.2.

[40]   Rec. Doc. 8, State's Response, p. 8 n. 3.

under the Fourteenth Amendment."); *United States v. Agurs*, 427 U.S. 97, 103 (1976) (due process is violated by the "knowing use of perjured testimony").    "The Supreme Court has never held that due process is offended by a conviction resting on perjured testimony where the prosecution did not know of the testimony's falsity at trial."    *LaMothe v. Cademartori*, No. 04–3395, 2005 WL 3095884, at *5 (N.D. Cal. Nov. 15, 2005) (citing *Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of certiorari) (noting that the Supreme Court has yet to consider the question of whether due process is violated by a conviction based on perjured testimony regardless of the prosecutor's knowledge)); *Hysler v Florida*, 315 U.S. 411, 413 (1942) (rejecting the notion that "mere recantation of testimony is in itself ground for invoking the Due Process Clause against a conviction").

This Court has considered and rejected similar claims in the past based on binding federal precedent, when, as here, a victim later recanted her trial testimony, but there was no evidence that the prosecution *knowingly* presented false testimony.    *Pierre v. Vannoy*, Civ. Action 16-1336, 2016 WL 9024952 (E.D. La. Oct. 31, 2016), *adopted in part and relief granted*, 2017 WL 2267195 (E.D. La. May 23, 2017).    In *Pierre*, the petitioner was convicted of aggravated rape of a child under the age of 13 where the victim falsely testified at trial that she had not been sexually active other than petitioner's abuse.    The new information amounting to a recantation of a significant aspect of the victim's testimony came to light while the direct appeal was pending and shaped the post-conviction proceedings. Although the state district court granted relief on the "actual innocence" claim, finding it

warranted a new trial, and the court of appeal narrowly upheld that ruling, the Louisiana Supreme Court reversed.    Pierre filed a federal application for habeas corpus relief.

In grappling with the admittedly troubling claim, the United States Magistrate Judge dutifully applied controlling federal precedent and denied the petition after thoroughly analyzing claims asserting actual innocence, denial of due process and a fair trial, violations under *Brady* and *Napue*, and denial of the right of confrontation.    The Magistrate Judge rejected the due process claim recognizing that "[t]he newly discovered evidence must be material to some underlying constitutional violation to warrant habeas relief."    *Pierre*, 2016 WL 9024952, at *11.    Yet, in *Pierre*, neither the State nor Pierre could have known that her testimony was false at the time of trial.    The Magistrate Judge found "<u>no</u> indication that <u>the State</u>, either through prosecutorial conduct or omission or through the court's exclusion of evidence, was involved in the alleged due process violation in any way," thus creating a "substantial barrier" to any constitutional due process violation under existing federal precedent.    *Pierre*, 2016 WL 9024952, at *13.    Thus, despite the Magistrate Judge's personal conclusion that Pierre should receive a new trial because the newly discovered evidence of the victim's untrustworthiness establishes that he did not receive a fundamentally fair trial, he was bound by controlling federal law that would not allow for relief unless the State had been complicit in the false testimony.    *Id*. at *17-18.

Ultimately, the Magistrate Judge's recommendation was rejected and the petition was granted by the District Judge.    However, that ruling was subsequently overturned by the

United States Fifth Circuit Court of Appeals.    *Pierre v. Vannoy*, 891 F.3d 224 (5th Cir. 2018), *cert. denied*, 139 S.Ct. 379 (2018).    In reversing the district court, the United States Fifth Circuit held that, based on controlling United States Supreme Court precedent, which has never held that a conviction violates due process when a victim testifies falsely if the State did not know and should not have known that the testimony was false, Pierre could not show that the state courts unreasonably applied clearly established federal law as determined by the Supreme Court.    *Id*. at 228-29.

In *Pierre*, the Fifth Circuit emphasized an earlier case, *Kinsel v. Cain*, where the Court had observed that " 'clearly established Supreme Court precedent demands proof that the prosecution made *knowing* use of perjured testimony' to establish a constitutional violation." *Id*. at 225 (quoting *Kinsel v. Cain*, 647 F.3d 265, 272 & n. 26 (5th Cir. 2011) (emphasis added)). Indeed, the Fifth Circuit could not reconcile the district court's decision in *Pierre* with *Kinsel*. In *Kinsel*, petitioner was convicted of sexually abusing his girlfriend's ten-year-old daughter based largely on the victim's testimony.    Eight years later, she recanted her testimony. Petitioner sought a new trial.    After holding an evidentiary hearing, at which the victim testified, the trial court ordered a new trial, but the state appellate court reversed.    The Louisiana Supreme Court affirmed and his federal habeas corpus application was eventually dismissed.    In analogizing *Kinsel* to *Pierre*, the Fifth Circuit explained:

> *Kinsel* is practically indistinguishable from this case. In *Kinsel*, as here, a
> Louisiana jury found the defendant guilty of child rape "based primarily on
> [the victim's] trial testimony." 647 F.3d at 266. The victim in *Kinsel* later
> recanted her accusations. *Id.* at 266, 268. We nevertheless denied relief. As we

explained, we could not "say that the state court unreasonably applied established federal law in determining that Kinsel's due process rights were thus not violated" because the State "did not know that [the victim] was lying at trial." *Id.* at 272. "In fact," we emphasized, "Kinsel ultimately does not allege a constitutional error at all given that the prosecutors did not knowingly present false testimony at his trial." *Id.* It is impossible to square the grant of habeas in this case with our denial of habeas in *Kinsel*.

*Pierre*, 891 F.3d at 229 (footnote omitted).

In *Kinsel*, because the petition was second or successive, the Fifth Circuit addressed the AEDPA standards for filing (*i.e.*, whether the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense).   The *Kinsel* court reasoned:

Kinsel asserts in his application that (1) he is "actually innocent of the crime," *i.e.*, he did not sexually abuse A.M., as supported by her newly discovered recantation, and (2) his rights "to a fair trial, due process of law, and his right to confront his accusers, in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution" were violated. Although the newly discovered evidence of A.M.'s recantation does call her trial testimony into question, the Louisiana trial judge concluded, not that Kinsel was "actually innocent" and should therefore be exonerated because no reasonable juror could convict him in light of the recantation, but rather that Kinsel was entitled to a new trial because, if reasonable jurors should believe the recantation, none could convict "absent her testimony." In the end, the trial judge stated that he did not know when to believe A.M.—at trial or at the postconviction evidentiary hearing—and therefore determined that Kinsel should have a new trial. On appeal, the Louisiana Fifth Circuit likewise found A.M.'s recantation to be "unreliable and inconsistent."

Under the AEDPA, we must presume the correctness of the state court's factual finding that A.M.'s recantation lacked credibility, [41] recognizing that

_____

[41] *Id.* § 2254(e)(1).

credibility determinations in particular are entitled to a strong presumption of correctness.[42]   Although Kinsel could have rebutted this presumption,[43]   he has not succeeded in doing so.[44]   We conclude, therefore, that Kinsel's reliance on A.M.'s recantation alone does not satisfy his burden under § 2244(b)(2)(B)(ii).[45]

In addition, we agree with the district court that the Louisiana Fifth Circuit reasonably determined that Kinsel has not established that errors at trial violated his rights under the Due Process Clause, the Confrontation Clause, or the Sixth Amendment.

\*      \*      \*

---

[42]   *See Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are virtually unreviewable by the federal courts." (internal quotation marks and citations omitted)).

[43]   *See Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

[44]   On this point we think it important to clarify that, although we do not consider state court credibility determinations when determining whether a petitioner has made a *prima facie* showing of his entitlement to bring a successive petition, *In re Wilson*, 442 F.3d 872, 878 (5th Cir. 2006), such determinations may be relevant when, as here, we are tasked with determining whether a petitioner has actually satisfied § 2244(b)(2)(B)'s requirements.

[45]   To the extent that Kinsel asserts a freestanding actual innocence claim, *i.e.*, that his continued imprisonment itself violates the Eighth Amendment and warrants habeas relief, *see Herrera v. Collins*, 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), we have repeatedly stated that such claims are not cognizable in the Fifth Circuit. *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir.2003) (collecting cases). Moreover, even if we were to consider the merits of that claim, because "the threshold showing for such an assumed right would necessarily be extraordinarily high," *Herrera*, 506 U.S. at 417, 113 S.Ct. 853, Kinsel would not be able to meet it for the same reasons he cannot meet the lesser AEDPA standard, i.e., recantations are suspect and A.M. is not a credible witness. *See House v. Bell*, 547 U.S. 518, 554–55, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006).

In sum, Kinsel has not established by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense. In fact, Kinsel ultimately does not allege a constitutional error at all given that the prosecutors did not knowingly present false testimony at his trial.

*Kinsel*, 647 F.3d at 270-71 (footnotes in original).

The United States Tenth Circuit Court of Appeals used similar reasoning in rejecting habeas relief on a petitioner's due process claim raised after a sexual abuse victim recanted her testimony. *Farrar v. Raemisch*, 924 F.3d 1126 (10th Cir. 2019). Petitioner's stepdaughter, alleged to have been assaulted sexually and abused by petitioner when she was in the eighth grade, supplied the prosecution's only direct evidence of Farrar's guilt. While his direct appeal was pending, the victim recanted. He was allowed to proceed with a new trial motion and the victim testified at an evidentiary hearing that she had fabricated her allegations of sexual abuse. The trial court found that the recantation was not credible and denied the motion. His further attempts for relief in the state courts and federal district court were unsuccessful. On *de novo* review from the federal district court's denial of habeas relief, the Tenth Circuit affirmed, finding no evidence of an underlying constitutional violation. The Court held that the victim's recanted testimony, absent knowledge on the part of the State, did not violate due process under controlling precedent. *Farrar*, 924 F.3d at 1131-32. He sought certiorari arguing that the Supreme Court should resolve the circuit split regarding whether the Due Process Clause is violated when the prosecution relies on material, perjured testimony to secure a conviction, but did not know

the testimony was perjured until after the trial.     The United States Supreme Court denied

his petition for writ of certiorari.     *Farrar v. Williams*, 141 S.Ct. 234 (2020).

Here, knowledge on the part of the prosecution is clearly lacking.     Kitzler has not

alleged that the prosecution knew or should have known that the victim would perjure

herself at trial.     Nor does the record support any such assertion.     K.K. testified at the

evidentiary hearing on the motion for new trial that she told only one version of the events—

that Kitzler raped her—and maintained that story to the investigating authorities,

counselors, prosecutors, and on the stand at trial.[46]     She came forward with a different

story and recanted her trial testimony to her mother several days after she was returned

home from foster care and the trial had concluded.     Her affidavit was prepared after trial

in conjunction with the new trial motion.

Despite ample time to investigate and uncover *Brady* evidence, nothing was ever

presented in the state courts to show that the prosecution had knowledge about K.K.'s false

testimony.     As the state district court observed when denying the claim, in the three years

since the post-conviction relief application was filed and more than two years since counsel

for Kitzler referenced "missing documents" to establish that the State had access to material

evidence that it failed to disclose, no such proof existed, and "waiving the red flag of *Brady* is

not sufficient to establish a violation of the State's obligation to provide discovery."[47]

---

[46]   State Rec., Vol. 3 of 11, Transcript of New Trial (April 24, 2015), pp. 8-13.

[47]   State Rec., Vol. 4 of 11, State District Court Order denying PCR.

Kitzler's allegation that K.K.'s recanted testimony was material impeachment evidence and valuable for the defense insofar as K.K.'s credibility, while true, does not afford him relief absent proof that it was known to the prosecution at the time of trial.     The State could not withhold evidence it did not possess and that only surfaced after trial.     The denial of relief as to the *Brady* claim was not contrary to or an unreasonable application of United States Supreme Court precedent.   Similarly, the *Napue* claim lacks merit because no evidence exists to show that the State knowingly presented or failed to correct K.K.'s allegedly perjured testimony at trial.[48]     These claims do not warrant federal habeas corpus relief.

*2. Newly Discovered Evidence of K.K.'s Level of Competency*

Kitzler claims that newly discovered evidence showed that K.K. was not competent to testify at trial and questions why the report was not presented at the new trial hearing. The claim is based on a letter Kitzler received from the office of his trial counsel dated October 15, 2015.[49]     The letter explained that they were providing him with an evaluation

---

[48]   Nor did the state courts find her recantation testimony reliably truthful.   This credibility determination was made by the state court, albeit not in the context of a *Napue* claim concerning perjury, but in applying state law considerations for a new trial.   The Louisiana First Circuit observed that K.K.'s recantation, *if believed*, would create a reasonable doubt of guilt in the minds of jurors.   However, the court went on to determine whether any special circumstances existed to suggest the truthfulness of her latest testimony given at the evidentiary hearing on the motion for new trial.   And after comparing her trial testimony with her testimony from the new-trial hearing, the appellate court determined that "the more reasonable inference of truthfulness appears to lie with K.K.'s initial story that she was raped by defendant." *Kitzler*, 2016 WL 3746380, at *7.

[49]   State Rec., Vol. 4 of 11, Tab 3-A, Exhibit B.

of K.K. that was mistakenly left out of his file.    The evaluation was done by clinical and forensic psychologist, Alicia Pellegrin.    The evaluation was reported in a letter to trial counsel dated January 29, 2015.    Thus, Kitzler's "newly discovered evidence" is a reported psychological evaluation of the victim requested by his trial counsel post-trial after she recanted her trial testimony.

In the report, Dr. Pellegrin set forth that she met with K.K. for an evaluation of her cognitive functioning and to assess whether she was competent to offer her prior testimony that her stepfather molested her.    At the time of the evaluation, K.K. insisted she was influenced to give false testimony about having been sexually abused and now maintains that the abuse never occurred.    Dr. Pellegrin further documented that her overall intelligence was at just above the range of intellectually deficient and that she had an unsophisticated understanding of the basic workings of the legal system, evincing no understanding of the consequences of lying under oath.    She concluded that K.K. was incompetent to give testimony and anticipated two to three additional sessions in order to "complete the competency restoration work with her" to know that she is competent to participate in upcoming legal proceedings.    Kitzler also suggests that the newly discovered report raises the possibility that his trial counsel was "unconstitutionally ineffective in not presenting the report or following up on Dr. Pellegrin's work."[50]

This claim was raised during post-conviction relief proceedings and construed by the

---

[50]   Rec. Doc. 3-1, p. 15.

state district court as a claim under state law (citing La. C.E. art. 601) that the victim's trial testimony should be rejected because she was not competent to testify, and as a separate claim of ineffective assistance of trial counsel.    The state courts denied relief on the merits.

To the extent Kitzler challenges the state courts' rejection of this claim under any state-law standards for assessing the victim's competency at trial, that claim is not cognizable on federal habeas corpus review.    The Court reiterates that claims that do not involve a question of federal or constitutional law, and merely dispute the correctness of a ruling under state law, fall outside the scope of federal habeas corpus review.[51]    *See Haygood v. Quarterman*, 239 F. App'x 39, 42 (5th Cir. Jun. 14, 2007) (citing *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991)) (state court's denial of a motion for a new trial does not necessarily constitute a violation of a federal constitutional right).    As noted earlier, a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding," and instead is limited to review of questions of federal constitutional dimensions. *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (citation and quotation omitted); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law).    "[I]t is not the province of a federal habeas court to reexamine state-court

---

[51]   The competency analysis was done at trial counsel's request after trial.    The victim's competency was not an issue at trial.    No trial court ruling was made during trial proceedings because no motion was set forth challenging her competency.    Thus, no federal constitutional issue exists concerning a particular evidentiary ruling below in the state courts, which might present a question of whether or not he was denied a fundamentally fair trial based on an egregious error of constitutional dimension.    *See, e.g.*, *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991).

determinations on state-law questions."   *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Molo v. Johnson*, 207 F.3d 773, 776 n. 9 (5th Cir. 2000) ("Federal habeas review does not extend to state court conclusions of state law.").

Nor is Kitzler entitled to relief on his federal claim of ineffective assistance of counsel.[52]   Kitzler claims that he was denied effective assistance because trial counsel failed to present the evaluation of K.K.'s competency during the new-trial hearing or to follow up on Dr. Pellegrin's work.   He raised the claim on post-conviction review and the state courts denied the claims on the merits under controlling federal law, *Strickland v. Washington*, 466 U.S. 668 (1984).   Because the claims were adjudicated on the merits in state court, habeas relief is available only if that adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.   28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86 (2011).   "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."   *Richter*, 562 U.S. at 105 (citations omitted).   The Supreme Court has stressed, in no uncertain terms, that "a federal court may grant relief only if *every* " 'fairminded juris[t]' " would agree that *every* reasonable lawyer would have made a different decision.   *Dunn v. Reeves*, 141 S.Ct. 2405, 2411 (2021) (citing

---

[52]   The State submits that he has not raised a claim of ineffective assistance of counsel in his federal petition by his merely suggesting a possibility that counsel was unconstitutionally ineffective, but nevertheless addressed the claim, to the extent it was presented.   Rec. Doc. 8, p. 13.   The state courts below considered the claim on the merits. The Court will consider the separate claim on the merits.

*Richter*, 562 U.S. at 101, 131 S.Ct. 770).

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.   Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.   *Strickland v. Washington*, 466 U.S. at 697.   A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."   *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e.* deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.   *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.   *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).   Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689.   "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"   *Lockhart v.*

*Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).    A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.    *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."    *Strickland*, 466 U.S. at 694.    In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

On habeas review, scrutiny of counsel's performance "must be highly deferential" and the Court will "indulge a strong presumption that counsel's conduct falls within the wide range of objectively reasonable professional assistance."    *Strickland*, 466 U.S. at 689. Here, the state district court determined that trial counsel reasonably chose not to use Dr. Pellegrin's evaluation, which he requested after trial concluded and received the same day as the first evidentiary hearing on the motion for new trial.    That same day, K.K. invoked her right not to testify under the Fifth Amendment on the advice of appointed counsel.[53] Her actions that day, in weighing and accepting appointed counsel's advice not to offer testimony that would admit to perjury, due to the consequences of that decision, strongly

---

[53]    State Rec., Vol. 3 of 11, Transcript of Evidentiary Hearing on Motion for New Trial (January 29, 2015), pp. 16-20. *See also*, Rec. Doc. 3-2, pp. 40-42 (Trial counsel's letter with Dr. Pellegrin's evaluation report attached).

suggested that she, in fact, understood the consequences of lying under oath, thus calling into question the basis of Dr. Pellegrin's conclusion that K.K. did not understand the concept of perjury.    Furthermore, the defense wanted the trial court to believe K.K.'s recantation. Yet, the recent Dr. Pellegrin opinion questioning K.K.'s competency to testify at the trial only a few months earlier, based on her deficient cognitive functioning and intellect, likely would have been more damaging for the defense and exceedingly difficult to overcome by showing that K.K.'s competency had been sufficiently "restored," in record time for the new-trial evidentiary hearing.    As the district court reasonably found, counsel did not perform deficiently in not presenting the evaluation during the new trial hearings.    Furthermore, even if the victim were subject to influence based on her deficiencies, her mother could have exerted influence over her current testimony just as easily as Almanza could have influenced her trial testimony.    Thus, evidence of K.K.'s deficiencies in the evaluation would not have altered the outcome of the new trial ruling.    Kitzler has not shown a reasonable probability that, but for counsel's failure to present K.K.'s evaluation, the result of the proceeding would have been different.

       In summary, Kitzler has not shown that the state-court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.    Accordingly, under the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## <u>RECOMMENDATION</u>

For the foregoing reasons, it is **RECOMMENDED** that Kitzler's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[54]

New Orleans, Louisiana, this ___2nd___ day of _____May_____, 2023.

**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[54]  *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.